## SCOTT v. GRAND UNITED ORDER OF ODD FELLOWS, DISTRICT GRAND LODGE NO. 21.

### No. 2094.

Court of Appeal of Louisiana. First Circuit.

April 10, 1940.

Sam J. D'Amico, of St. Francisville, for appellant.

Breazeale & Sachse, of Baton Rouge, for appellee.

OTT, Judge.

The defendant Order issued a policy on the life of Isaiah Scott for $500 in which the plaintiff was named as the beneficiary. The insured died in August, 1935, and as the Order was unable to pay all of the claims against it, a plan was worked out with the approval of the Insurance Department of the State whereby partial payments were to be made on matured death claims and the balance was to be loaned to the Order by the respective claimants until such time as these claims could be paid in full with interest on the balance due.

The plaintiff in this suit signed one of these loan certificates wherein she agreed that her claim under the policy was to be considered as fully paid and discharged. She was paid the sum of $75 and agreed to loan the balance of $425 to the Order and the Order agreed to repay said amount with interest at the rate of 3% per annum, payable semi-annually, the principal to be repaid only in the event that after such repayment the Order should be left possessed of sufficient assets to meet all its liabilities and to maintain a fund for payment of all death claims arising after the date of the certificate (December 27, 1935).

The certificate involved in this suit is similar to several others issued by the Order to cover matured death claims, one of these others being the one involved in the case of Adeline Colbert against this same Order, where we upheld the legality and validity of the certificate. See Colbert v. District Grand Lodge No. 21, Grand United Order of Odd Fellows, La.App., 176 So. 633, and Id., La.App., 178 So. 694.

The certificate in the present case is attacked on the ground that plaintiff's signature thereto was obtained through fraud and misrepresentation on the part of an agent of the Order. The charge of fraud consists in the allegation that the agent of the Order stated to plaintiff, an illiterate and ignorant colored woman of low mentality, that the agreement which she was signing was one whereby the defendant was to pay her $75 every sixty days until the full balance of $425 was paid, whereas, in truth and in fact and to the knowledge of the defendant, said agreement was a loan agreement whereby she agreed, without her consent and knowledge, to loan to the defendant the balance due her under the policy.

The defendant denied any fraud on the part of its agent, and averred that the plaintiff signed the agreement by which her claim under the policy was novated and she, along with others in a similar situation, accepted the plan of settlement for the unpaid portion of her claim which plan was evolved by the Order with the approval of the Insurance Examiner of the State. It also alleged that an additional payment of $25 had been made on the certificate in July 1936, and interest had been paid thereon.

The trial court rejected the plaintiff's demands on the ground that she had failed to prove that the agent of the Order had perpetrated a fraud on her. She has appealed.

The case involves only questions of fact. Three witnesses testified for the plaintiff and one for the defendant. The plaintiff herself did not testify. The trial judge states in his reasons for judgment that when she was called to the stand as a witness, she presented the appearance of an idiot and her answers to questions by the court confirmed the impression of her incompetency. However, the issue of her incompetency either as a litigant or as a witness is not raised by either side.

Sarah Scott, the mother of the plaintiff and the one who handled her affairs and took care of her, testified that Ringgold, an agent of the Order, came to her home to settle the claim; that he brought $75 and stated that the Order was not able to pay all the claim at once; that it would pay $75 every 60 days until it was all paid; that she told him that the girl was not able to speak for herself and she told Ringgold that her daughter wanted at least half of the money, whereupon the agent told her that the money belonged to the girl and that was the best the Order could do. She testified that Ringgold was supposed to be reading the certificate where it said the Order wasn't able to pay it all at once, but it would pay her $75 and then pay $75 every 60 days; that he was then holding the paper up to his face like he was reading from it. She admits receiving $25 for her daughter as a payment on the certificate in July, 1936, and at least two payments of interest on it.

The witness signed the certificate with the plaintiff as a witness and seems to have handled the whole transaction for her. She admits that she had known Ringgold all of his life and she thought he was a truthful man. She says that Ringgold told her that the Order could not pay any more than the $25, but agreed to make an effort to get the order to pay more. She says that she continued to demand further payment and finally consulted a lawyer who told her she would just have to wait on the Order.

Two other witnesses, Abner Thompson, a former secretary of the local Lodge, and Willie Scott, an uncle of the plaintiff, testified that they were present when the agreement was signed. They did not hear all of the conversation between Ringgold and Sarah Scott but did hear the former say that the Order was not able to pay all of the claim, but would pay off the balance at the rate of $75 every 60 days.

Ringgold died in the latter part of 1937 or the first part of 1938, and of course he did not testify in the case. We think since his voice is silenced and he had no opportunity of telling his side of what transpired at the signing of this agreement, it is fair to assume that he would have denied making any fraudulent statements. The record shows that Ringgold was a reliable and fairly intelligent colored man, and it is hardly to be presumed that he would have departed from his duties in getting these agreements signed by promising to pay the balance of the claim at the rate of $75 every 60 days when he was fully aware of the condition of the Order and knew the very purpose and contents of these loan agreements.

William Kelsoe, the Grand Master of the Order, testified that after the plan was worked out with the approval of the Insurance Examiner of the State, Ringgold and other adjusters were sent out to get the signature of the claimants on claims amounting to some seventy thousand dollars; that these adjusters had instructions to tell the claimants the truth about the matter and to inform them that if these loan agreements were not signed the Order would have to go into receivership in which case they might get nothing. No instructions were given to Ringgold or any one else to promise any claimants to pay the remainder of their claims at the rate of $75 every 60 days, or on any other terms than set forth in the uniform certificates. Some 87 per cent of the claimants signed these agreements.

It is significant to note that this suit was not brought until June, 1939, more than three and a half years after the loan agreement was signed and more than two and a half years after the entire balance should have been paid if it was to be paid at the rate of $75 every 60 days as contended by the plaintiff. In the meantime Ringgold had died and plaintiff had been paid and accepted one payment and the interest on the loan agreement. Under this situation, it was necessary that the alleged fraud be proved by clear and convincing evidence. The trial judge found that the plaintiff had failed to make such proof. We find no manifest error in his finding of fact, and under the well known rule, we see no reason to disturb his findings.

For the reasons assigned, the judgment appealed from is affirmed.